**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**October 9, 2013**

# In the Court of Appeals of Georgia

A13A0927. HOWLAND et al. v. WADSWORTH.

RAY, Judge.

Ellen Rebecca Wadsworth sued Gregory Howland, PA-C, Paul Paustian, M.D., and their employer, Georgia EM-I Medical Services, P.C. (the "defendants"), asserting claims for ordinary negligence and gross negligence, alleging that the defendants failed to provide her with necessary medical treatment while she was in the emergency department of the Houston Medical Center.[1] At trial, the defendants moved for a directed verdict, claiming that OCGA § 51-1-29.5 applied to Wadsworth's claims because her cause of action arose out of the provision of "emergency medical care" in a hospital emergency room and that Wadsworth failed

---

[1] Although other defendants were named in the suit, the other defendants were dismissed pursuant to a consent order prior to trial.

to prove gross negligence by clear and convincing evidence as required by OCGA § 51-1-29.5 (c). Wadsworth argued that the statute did not apply because the treatment she received was not "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5) and that, therefore, the jury should be allowed to consider ordinary negligence under the preponderance of evidence standard. The trial court denied the motion for directed verdict, finding that the evidence was sufficient to create a jury issue on gross negligence. The court further found that the evidence created a jury issue as to whether the medical care provided to Wadsworth constituted emergency medical care, which would determine which standard of care and burden of proof would apply. Consequently, the trial court charged the jury on both ordinary negligence and gross negligence, along with the respective burdens of proof. The court further charged the jury on the statutory definition of "emergency medical care" and instructed the jury that their determination as to whether Wadsworth's claims involved the provision of emergency medical care would determine which standard of care and burden of proof to apply. Ultimately, the jury applied the ordinary negligence standard of care and returned a verdict in favor of Wadsworth in the amount of $5,000,000.

The defendants appeal, arguing that the trial court erred: (1) by allowing the jury to determine, as a question of fact, whether Wadsworth's claims arose out of the

2

provision of "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5); (2) in failing to decide, as a matter of law, that the medical care provided to Wadsworth constituted emergency medical care; (3) in denying their motion for directed verdict based on Wadsworth's failure to show gross negligence by clear and convincing evidence; and (4) in providing confusing instructions to the jury concerning the applicable standard of care and burden of proof. For the reasons that follow, we affirm.

At the outset, we note that "[t]his Court reviews the judgment entered by the trial court after approval of a jury verdict upon the any evidence test, absent any material error of law." (Citation and punctuation omitted.) *Timmons v. Cook*, 287 Ga. App. 712, 712 (652 SE2d 604) (2007). Additionally, when a question of law is at issue, "we owe no deference to the trial court's ruling and apply a de novo standard of review." (citation omitted.) *Artson, LLC v. Hudson*, ____ Ga. App. ___ SE2d 68 (2013).

So viewed, the evidence shows that sometime in late November 2008, Wadsworth began experiencing pain in her feet which appeared to be getting worse each day. On the morning of November 27, 2008, Wadsworth noticed that her feet

were cold and that she was unable to warm them. As the pain in her feet had increased to the extent that she could no longer walk, she decided to call 911.

An ambulance arrived and transported Wadsworth to the Houston Medical Center's emergency room. Prior to arriving at the emergency room, a paramedic had assessed Wadsworth's condition and noted that she had normal vital signs and normal blood circulation in her legs. The paramedic obtained a brief medical history from Wadsworth and noted that she had a history of diabetes and hypertension. Based on his assessment of Wadsworth's condition, the paramedic determined that she did not require any treatment during her transport to the emergency room.

Upon her arrival at the Houston Medical Center's emergency room, Wadsworth was classified as a "level 4" patient, meaning that her condition was "non-urgent." Wadsworth was assigned a bed in "C-pod," which is an area designated for the examination and treatment of patients who are expected to be "in and out in 90 minutes or less." The nurse that did the initial triage noted that Wadsworth was complaining of significant pain in both feet that had increased over the past couple of days and that it was hard for her to walk. The nurse performed a physical assessment of Wadsworth and noted that her feet were cold to the touch, but that she had "positive" or "palpable" pulses in her feet at the time.

4

Wadsworth was eventually examined by defendant Gregory Howland, a physician assistant who worked in the emergency room of the Houston Medical Center. Howland noted that Wadsworth was in a "moderate" amount of pain and ordered her morphine, which succeeded in alleviating some of her pain. Howland considered Wadsworth to be relatively stable during his examination, and he believed that her status had improved while she was in the emergency room. Based on his review of Wadsworth's symptoms and past medical history of diabetes and hypertension, Howland engaged in a differential diagnosis, which included considering the possibilities of acute arterial occlusion (blocked arteries), deep vein thrombosis (DVT), and cellulitis (infection). Howland ordered Wadsworth to undergo a venous ultrasound exam, which ruled out the possibility of DVT. Howland noted that Wadsworth's feet were cool, rather than cold, and he attributed the coolness of her feet to her diabetes. Although Howland noted a diminished pulse in Wadsworth's feet, he considered the pulse to be sufficient to rule out an acute arterial occlusion.[2]

---

[2] An acute arterial occlusion (or complete arterial blockage) would constitute an emergency, because it can cause a heart attack, stroke, or loss of limb. A diminished pulse can be a sign of arterial insufficiency (or partial arterial blockage), which can be treated on a nonemergency basis. At trial, three of the defendants' own expert witnesses testified that, in their opinion, Wadsworth did *not* have an acute arterial occlusion at the time she was in the emergency room on November 27, 2008.

5

However, Howland did not order an arterial ultrasound or any other diagnostic tests to determine whether Wadsworth's diminished pulse was caused by a partial arterial blockage. Based on the results of a blood test which indicated that Wadsworth had an elevated white blood cell count, together with the fact that Wadsworth was exhibiting signs of redness and tenderness in her lower legs and feet, Howland diagnosed Wadsworth as having cellulitis. Cellulitis can be treated with antibiotics on a nonemergency basis.

Howland discussed his diagnosis and his proposed plan of care with his supervising physician, Dr. Paul Paustian. Dr. Paustian did not speak with or personally examine Wadsworth, but he agreed with Howland's diagnosis and plan of care. Although Wadsworth wanted to be admitted to the hospital for observation, the defendants gave Wadsworth a prescription for antibiotics and pain medication and discharged her. From the time of her arrival to the time of her discharge on November 27, 2008, Wadsworth spent approximately three hours in the emergency room.

In the early morning of November 28, 2008, approximately twelve hours after her discharge, an ambulance responded to an emergency call at Wadsworth's residence. Upon their arrival, paramedics found Wadsworth to be unresponsive, with no blood pressure or pulse. After a paramedic performed CPR, Wadsworth's vital

6

signs improved, and she was again transported by ambulance to Houston Medical Center's emergency room. Upon her arrival, Wadsworth had low blood pressure, a diminished pulse, and slow respiration, which are indicators of a near cardiac arrest. Later that afternoon, doctors performed an arteriogram on Wadsworth and determined that the arteries behind both of her knees were completely blocked. Doctors later determined that Wadsworth's lower legs had suffered damage to the extent that they were no longer salvageable, and Wadsworth had both legs amputated below the knees.

1. In their first enumeration of error, the defendants contend that the trial court erred in allowing the jury to "interpret" OCGA § 51-1-29.5 when it allowed the jury to determine whether the medical care provided to Wadsworth on November 27, 2008, arose out of the provision of "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5). Specifically, the defendants argue that the issue of whether a claim involves emergency medical care is a question of law for the court because it requires interpretation of the statute. We disagree.

OCGA § 51-1-29.5 (c) provides, in pertinent part:

In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department . . . no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

OCGA § 51-1-29.5 (a) (5) defines "emergency medical care" as:

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.

This Court has previously held that the issue of whether a claim involves the provision of emergency medical care may be a question of fact for the jury. See *Bonds v. Nesbitt*, ___ Ga. App. ___ (1) (Case No. A13A0348, decided July 12, 2013) (petition for writ of certiorari filed July 30, 2013, Case No. S13C1681) (the question of whether the plaintiff was stabilized and capable of receiving medical treatment as

a nonemergency patient within the meaning of OCGA § 51-1-29.5 (a) (5) was a question of fact for the jury).

Furthermore, in cases involving a health liability claim arising out of the provision of emergency medical care in an emergency room, the jury is required to consider, inter alia, "[t]he circumstances constituting the emergency" and "[t]he circumstances surrounding the delivery of the emergency medical care." OCGA § 51-1-29.5 (d) (3) and (4). Thus, the statute contemplates that, in some cases, there may be a jury issue as to whether the patient at some point had become stabilized and, therefore, was capable of receiving medical treatment as a nonemergency patient. "In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly . . . ." OCGA § 1-3-1 (a). "The legislative intent is determined from a consideration of the entire statute." *Restina v. Crawford*, 205 Ga. App. 887, 888 (424 SE2d 79) (1992).

In this case, the jury had to determine whether Wadsworth's claims arose out of the provision of emergency medical care. The defendants argue that the jury had no guidance, either from expert witnesses or from the trial court, on how to make this determination. However, the trial court charged the jury on the statute's definition of

9

"emergency medical care," and none of the words or terms within that definition are beyond the ken of the average juror.

As the issue of whether a claim involves emergency health care is not solely a matter of law for the trial court, this enumeration lacks merit.

2. The defendants contend that, under the particular facts of this case, the trial court erred in failing to decide as a matter of law that the treatment provided to Wadsworth in the emergency room on November 27, 2008, constituted emergency medical care.

Citing *Pottinger v. Smith*, 293 Ga. App. 626 (667 SE2d 659) (2008) and *Johnson v. Omondi*, 318 Ga. App. 787 (736 SE2d 129) (2012) (physical precedent only) (petition for writ of certiorari granted, Case No. S13G0553), the defendants argue that the gross negligence standard of OCGA § 51-1-29.5 applies to misdiagnoses and improper discharges arising out of the provision of emergency medical care in a hospital emergency room. The defendants' reliance on these cases is misplaced. In *Pottinger* and *Johnson*, neither plaintiff argued on appeal that OCGA § 51-1-29.5 did not apply to their claims, nor did they argue that care provided was not "emergency medical care" as defined by OCGA § 51-1-29.5 (a) (5). See *Pottinger*, supra at 628; *Johnson*, supra at 790, n. 5. Rather, the only issue in both

10

cases was whether gross negligence was shown by clear and convincing evidence. Here, Wadsworth argues that she was stabilized and capable of receiving appropriate, nonemergency medical treatment, thereby triggering an exception to the statute which would allow the jury to consider ordinary negligence.

In this case, an issue of fact existed as to whether Wadsworth's claims arose out of the provision of emergency medical care. Wadsworth was admitted into the emergency room as "non-urgent" patient; yet, she was experiencing a medical condition which included symptoms of significant pain in her feet, coldness in her feet, and the inability to walk. Although Howland's differential diagnosis included the possibility of an arterial occlusion or deep vein thrombosis,[3] there is evidence to show that Wadsworth did not have either of these conditions at that time.[4]

OCGA § 51-1-29.5 (a) (5) excludes from its definition of emergency medical care the "medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient . . . ." Thus, the defendants' conduct becomes subject to the ordinary negligence standard of care,

---

[3] In the absence of immediate medical attention, these conditions could reasonably be expected to result in placing a patient's health in serious jeopardy.

[4] The defendants certainly did not view Wadsworth as being in an emergency state, and their treatment of her was consistent with their assessment of the situation.

11

rather than the gross negligence standard, if Wadsworth's condition had improved or at least stabilized, such that she was capable of receiving nonemergency care.

We note that an emergency room physician or health care provider may still claim the protection of the gross negligence standard of OCGA § 51-1-29.5 when he or she mistakenly concludes that a patient has become "stabilized" and "capable of receiving medical treatment as a nonemergency patient." *Bonds*, supra. In this case, however, that claim must be made to and the decision rendered by the jury.

Howland's determination that Wadsworth was relatively stable at all times and that her condition had improved while she was in the emergency room is some evidence that Wadsworth was in fact stabilized. Notably, the defendants' own experts testified that Wadsworth did not have an acute arterial occlusion when she presented to the emergency room on November 27, 2008, and there is no evidence that Wadsworth actually had deep vein thrombosis at that time. Furthermore, both Howland and Dr. Paustian determined that Wadsworth could be discharged, an indication that Wadsworth did not require emergency medical care.[5]

_____

[5] Given Wadsworth's symptoms and medical history, admitting her into the hospital for observation on a nonemergency basis would have been a viable and prudent alternative to discharging her, but the defendants declined to do so.

12

Viewing this evidence and all reasonable inferences in the light most favorable to the verdict, we conclude that whether Wadsworth at some point had stabilized and was capable of receiving medical treatment as a nonemergency patient within the meaning of OCGA § 51-1-29.5 (a) (5) was a question for the trier of fact. See *Bonds*, supra. Therefore, the trial court did not err in failing to decide, as a matter of law, that the care provided to Wadsworth was emergency medical care.

3. In their third enumeration of error, the defendants contend that the trial court erred in denying their motion for a directed verdict because Wadsworth failed to show gross negligence by clear and convincing evidence. Based on our holding in Divisions 1 and 2 above, together with the fact that the jury applied the ordinary negligence standard of care in entering its verdict in favor of Wadsworth, we need not address this enumeration.

4. In their final enumeration of error, the defendants contend that the trial court erred by issuing confusing jury instructions concerning the applicable standard of care and burden of proof. Specifically, the defendants argue that charging the jury on both standards of care inevitably confused the jury, and that the trial court unduly emphasized the ordinary negligence standard and the preponderance of evidence burden of proof.

13

On appeal, we review allegedly erroneous jury instructions under the plain legal error standard. *Carter v. Smith*, 294 Ga. App. 590, 592-593 (2) (669 SE2d 425) (2008). "[I]t is well established that jury instructions must be read and considered as a whole in determining whether the charge contained error." (Citation and punctuation omitted.) *West v. Breast Care Specialists, LLC*, 290 Ga. App. 521, 522 (1) (659 SE2d 895) (2008).

When viewed in its entirety, the trial court's charge in this case gave a full and correct statement of the law regarding the ordinary negligence and gross negligence standards of care, as well as the burden of proof applicable to each. Additionally, the trial court charged the jury on the statutory definition of "emergency medical care" and instructed the jury that their determination as to whether Wadsworth's claims arose out of the provision of emergency medical care would determine which standard of care to apply.

We find no merit in the defendant's argument that the trial court emphasized the ordinary negligence standard when it used the terms "negligent" and "negligence" during jury instructions. Furthermore, the trial court resolved any potential ambiguity in this regard by giving the following instruction:

Where I[ have] used the words 'negligent' or 'negligence' in this charge, you may substitute the words 'grossly negligent' or 'gross negligence' based upon the standard you find applies in this case.

We likewise find no merit in the defendants' argument that the trial court unduly emphasized the ordinary negligence standard through heavy repetition of the language of ordinary negligence and the related preponderance of the evidence burden of proof. The defendants cite *Jackson v. Rodriquez*, 173 Ga. App. 211 (325 SE2d 857) (1984), for the principle that "it is error to repeat again and again a portion of a charge which is more favorable to one party than the other." (Citation omitted.) Id. at 213 (2). Here, the trial court's references to ordinary negligence and preponderance of the evidence were appropriate in the context of the charge as a whole, and "mere repetition of a principle of law . . . will not [authorize] a reversal unless it appears from the charge as a whole that there was such undue emphasis as to result in an unfair statement of the law[.]" (Citation and punctuation omitted.) Id. Here, all of the charges were applicable and correct statements of law, and we find no undue emphasis. Accord *American Multi-Cinema, Inc. v. Walker*, 270 Ga. App. 314, 318 (3) (b) (605 SE2d 850) (2004).

Furthermore, "in order for a trial court's jury instruction to constitute reversible error, the party challenging the instruction must establish that the instruction was both legally erroneous and harmful." (Citations and punctuation omitted.) *West*, supra at 523 (1). Any perceived confusion in the jury instructions with regard to the applicable standard of care and burden of proof was effectively resolved in the verdict form that was given to the jury, which provided as follows:

> If you find that the medical care provided by the [d]efendants *was* 'emergency medical services' you should apply the standard of gross negligence proven by clear and convincing evidence.
>
> If you find that the medical care provided by the [d]efendants *was not* 'emergency medical services' you should apply the standard of ordinary negligence proven by a preponderance of the evidence.
>
> 1. We, the jury, apply the standard of care of:
> [ ] gross negligence.
> [ ] ordinary negligence.

For the above reasons, we find no reversible error.

*Judgment affirmed. Barnes, P. J., and Miller, J., concur.*

16