**SECOND DIVISION
MILLER, P. J.,
MERCIER, J., and PHIPPS, SENIOR APPELLATE JUDGE.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**January 27, 2021**

# In the Court of Appeals of Georgia

A20A1787. NEWTON et al. v. JACOBS et al.

PHIPPS, Senior Appellate Judge.

After obtaining a permit, Travis Jacobs burned property owned by his cousin, Frank A. Argenbright, Jr., to burn off crop residue and a pile of pine stumps. The fire escaped and burned property owned by Ronald Newton. The trial court granted summary judgment to Jacobs and Argenbright, finding that the Georgia Prescribed Burning Act shielded Jacobs and Argenbright from liability. Ronald and Stacey Newton[1] now appeal. For the following reasons, we affirm.

---

[1] Stacey Newton voluntarily dismissed all of her claims against Jacobs and Argenbright. However, the trial court's order granting summary judgment to Jacobs and Argenbright refers to both Newtons, and both Newtons appeal from the trial court's order.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Patton v. Cumberland Corp.*, 347 Ga. App. 501, 502 (819 SE2d 898) (2018) (citation omitted).

Argenbright owns a 15-acre tract in Brantley County. Argenbright bought the property to provide a place for his brothers and cousins and their children and grandchildren to hunt. When Argenbright purchased the property, he asked Jacobs to manage the property, and Jacobs agreed. Jacobs planned to burn the 15-acre field to burn off crop residue and a small pile of pine stumps. His purpose was to clear the area in order to replant it as a food plot for deer hunting. Jacobs, who is a retired Agricultural Stabilization and Conservation Service employee, has had years of experience with prescribed burning. As a child and a young man, he helped his father, who was a farmer, with burning fields, and he later burned his own fields. He also helped his father and grandfather burn wooded areas on their farms. To prepare for the burn of the Argenbright property, Jacobs cut firebreaks with a harrow on three

2

sides of the field he intended to burn. The Georgia Forestry Commission ("GFC") cut a firebreak on the fourth side of the field.

On the morning of March 28, 2017, Jacobs called the Brantley-Pierce County GFC Unit and requested a burn permit for that day. After considering the weather forecast and the fire danger rating for the day, the GFC issued Jacobs a permit. Jacobs' brother was present to assist him with the burn. Jacobs planned the burn for a day that he knew a GFC employee would be nearby to assist if necessary.

The permit had a "begin time" of 9:30 a.m. Sometime after 9:30 a.m., after testing the wind, Jacobs started the fire. From the point of ignition, Jacobs strung a line of fire along the four sides of the field, intending for the fire lines to meet roughly in the center of the field. When Jacobs and his brother had gone all the way around the field, Jacobs noticed that the fire had jumped the firebreak. At that point, Jacobs called for help from the GFC employee he knew was working nearby. The GFC employee came to the field and made another two firebreaks on the east side of the pre-existing break, more than doubling its initial size. The fire jumped the widened break, ultimately making its way to the Newtons' property, where it destroyed Ronald Newton's garage workshop, including various tools and car parts.

In June 2018, the Newtons filed suit against Argenbright and Jacobs. Argenright and Jacobs filed a motion for summary judgment, contending that the Georgia Prescribed Burning Act, OCGA §§ 12-6-145 - 12-6-149, protected them from liability. The trial court granted summary judgment to Argenbright and Jacobs, finding that Argenbright and Jacobs were entitled to the protections afforded by OCGA § 12-6-148 and that the record contained no evidence from which a jury could reasonably conclude that Jacobs was grossly negligent. This appeal followed.

1. The Newtons argue that the trial court erred in granting summary judgment to Jacobs and Argenbright based on its determination that Jacobs and Argenbright are entitled to the protections from liability provided by OCGA § 12-6-148. We disagree.

(a) The Newtons first contend that OCGA § 12-6-148 does not apply in this case because the fire did not meet the statutory definition of prescribed burning in OCGA § 12-6-147 (2). The Georgia Prescribed Burning Act defines prescribed burning as follows:

> "Prescribed burning" means the controlled application of fire to existing vegetative fuels under specified environmental conditions and following appropriate precautionary measures, which causes the fire to be confined to a predetermined area and accomplishes one or more planned land management objectives or to mitigate catastrophic wildfires.

4

OCGA § 12-6-147 (2). The Newtons argue that because the fire was not contained to a predetermined area, it was not a prescribed burn. We find this argument to be unpersuasive.

OCGA § 12-6-148 protects a property owner or the owner's agent conducting an authorized prescribed burn under the Georgia Prescribed Burning Act from liability for *"damages or injury caused by fire or resulting smoke unless it is proven that there was gross negligence in starting, controlling, or completing the burn."* OCGA § 12-6-148 (b).

The General Assembly's legislative intent in enacting the Georgia Prescribed Burning Act is set forth in OCGA § 12-6-146:

> (a) It is declared by the General Assembly that prescribed burning is a resource protection and land management tool which benefits the safety of the public, Georgia's forest resources, the environment, and the economy of the state. The General Assembly finds that:
>
> (1) Prescribed burning reduces naturally occurring vegetative fuels within forested areas. Reduction of such fuels by burning reduces the risk and severity of major wildfire, thereby lessening the threat of fire and the resulting loss of life and property;
>
> (2) Georgia's ever-increasing population situates urban development directly adjacent to fire prone forest lands. The use of prescribed fire to manage fuels in interface areas would substantially reduce the threat of damaging wildfire in urban communities;

5

(3) Forest land constitutes significant economic, biological, and aesthetic resources of state-wide importance. Prescribed burning on forest land serves to reduce hazardous accumulations of fuels, prepare sites for both natural and artificial forest regeneration, improve wildlife habitat, control insects and disease, and perpetuate fire dependent ecosystems;

(4) State and federally owned public use lands such as state parks, state and national forests, and wildlife refuges receive resource enhancement through use of prescribed burning;

(5) As Georgia's population continues to grow, pressures from liability issues and smoke nuisance complaints cause prescribed burn practitioners to limit prescribed burn activity, thus reducing the above-mentioned benefits to the state;

(6) Public misunderstanding of the benefit of prescribed burning to the ecological and economic welfare of the state exerts unusual pressures that prevent uninhibited use of this valuable forest resource management tool; and

(7) Fire benefits rare, threatened, and endangered plants, deer, turkey, quail, dove, and other game as well as numerous songbirds and other nongame species by the increased growth and yields of herbs and legumes. It also allows openings for feeding and travel.

(b) It is the purpose of this part to authorize and promote the continued use of prescribed burning for community protection, silvicultural, environmental, and wildlife management purposes.

The Newtons argue that while protecting a person who starts a fire from liability for damages caused by smoke, drifting ashes, or heat is a reasonable

6

objective of the General Assembly, it is unreasonable to believe that the General Assembly intended to protect a person who starts a fire from liability for allowing the fire to escape onto the land of others. However, the protections of OCGA § 12-6-148 apply not only to liability for damages from smoke, drifting ashes, or heat, but also to "damages or injury caused by fire." Thus, the General Assembly clearly contemplated that an authorized prescribed burn could escape the area intended to be burned. Consequently, we conclude that the OCGA § 12-6-148 (b) protection from liability applies even if the fire which was intended to be confined to a predetermined area escapes the predetermined area.

(b) The Newtons also contend that OCGA § 12-6-148 does not apply in this case because the burn was not conducted in accordance with the permit issued. Again, we disagree.

OCGA § 12-6-148 (a) provides:

Prescribed burning conducted under the requirements of this part shall:
(1) Be accomplished only when an individual with previous prescribed burning experience or training is in charge of the burn and is present on site until the fire is adequately confined to reasonably prevent escape of the fire from the area intended to be burned;
(2) Be considered in the public interest and shall not create a public or private nuisance;

7

(3) Be considered a property right of the landowner; and

(4) Be conducted in accordance with a permit issued under Part 3 of this article.

The Newtons acknowledge that a permit was issued to Jacobs, but contend that Jacobs failed to conduct the burn in accordance with the permit because he did not have a permit to burn agricultural land and he started the fire almost two hours later than the permitted time to start.

The permit issued to Jacobs has a section to indicate "type of burning" with three broad categories. The three broad categories are "agriculture," "silviculture," and "land clearing/machine piled natural vegetation." Within the category of agriculture, the permit has boxes to mark "improved pasture," "cultivated crop," "orchard," and "old fields." Within the category of silviculture" are boxes for "hazard reduction," "wildlife mgmt," "site prep," and "long leaf."

On the permit issued to Jacobs, the "type of burning" indicated was "land clearing/machine piled natural vegetation." The Newtons' argument that the permit issued to Jacobs was not marked to permit the burning of agricultural land appears to be based on the fact that the type of burning indicated was not one of the choices within the category of "agriculture." However, Jacobs testified that he intended to

8

burn a 15-acre field of crop residue and a pile of stumps for the purpose of using the area as a food plot for deer. The chief ranger of the Brantley-Pierce County GFC Unit stated in an affidavit that the burn permit issued to Jacobs was appropriate for the activity of clearing land of stump piles and land clearing for planting food plots. We find no support in the record to support the Newtons' argument that the fire was not conducted in accordance with the permit issued to Jacobs because the permit did not authorize Jacobs to burn agricultural land.

We are also unpersuaded by the Newtons' argument that Jacobs failed to conduct the burn in accordance with the permit because the fire was set about 11:19 a.m. The permit issued to Jacobs indicates a "begin time" of 9:30 a.m. The chief ranger of the Brantley-Pierce County GFC Unit stated in his affidavit that the time of the burn permit listed as the "begin time" is the earliest that the burn may begin and that the burn is not required to begin at the listed time. The Newtons argue that the chief ranger's affidavit compared to the face of the permit creates a factual dispute that precludes summary judgment. However, the Newtons point to no evidence in the record that supports their contention that the "begin time" on the permit was the time that the burn was required to start. Consequently, the Newtons' argument that the fire

9

was not conducted in accordance with the permit because the fire was started later than the "begin time" shown on the permit fails.

2. The Newtons contend that the trial court erred as a matter of law in granting summary judgment to Jacobs and Argenbright based on its determination that there was insufficient evidence of gross negligence to create a jury question. We disagree.

"'Gross negligence' is defined as the failure to exercise that degree of care that every man of common sense, however inattentive he may be, exercises under the same or similar circumstances; or lack of the diligence that even careless men are accustomed to exercise." *Patton*, 347 Ga. App. at 505 (2) (citations and punctuation omitted). See also OCGA § 51-1-4 ("In general, slight diligence is that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances. As applied to the preservation of property, the term 'slight diligence' means that care which every man of common sense, however inattentive he may be, takes of his own property. The absence of such care is termed gross negligence.") "In other words, gross negligence has been defined as equivalent to the failure to exercise even a slight degree of care[.]" *Heard v. City of Villa Rica*, 306 Ga. App. 291, 294 (1) (701 SE2d 915) (2010) (citation and punctuation omitted).

10

Generally, when facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and, if so, whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury. In cases wherein the evidence allegedly supporting the accusations of gross negligence is plain and indisputable, however, the court may resolve the questions of whether the defendant acted with gross negligence as a matter of law.

*Morgan v. Horton*, 308 Ga. App. 192, 198 (3) (707 SE2d 144) (2011) (citations and punctuation omitted).

The Newtons argue that the record contains sufficient evidence for a jury to conclude that Jacobs was grossly negligent. Specifically, the Newtons contend that the fire was started on a high fire danger day, that the wind was blowing at nine miles per hour at the time of the fire, and that Jacobs misunderstood the effect of humidity on fire behavior. However, even if we assume all of these facts to be true, the evidence in the record does not support a finding that Jacobs was grossly negligent. Before the day of the burn, firebreaks were cut on all four sides of the field that Jacobs intended to burn. Jacobs requested and obtained a burn permit on a day that he knew a GFC employee would be nearby to assist if necessary. Before starting the fire, Jacobs assessed the wind direction and selected his ignition point based on that

11

assessment. Consequently, we agree with the trial court's conclusion that "[e]ven assuming there was evidence sufficient to create a jury issue as to whether Jacobs was negligent in some way while starting, controlling, or completing the burn, there is no evidence from which a jury could reasonably conclude that he failed to exercise slight diligence and was therefore grossly negligent." Thus, the trial court did not err in granting summary judgment to Jacobs and Argenbright.

*Judgment affirmed. Miller, P. J., and Mercier, J., concur*.